IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ARLAN THIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | Case Number: 3:08-CV-00840-DRH-DGW |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

**Wilkerson, Magistrate Judge:**

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Chief Judge David R. Herndon pursuant to 28 U.S.C § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on plaintiff Arlan Thies's ("Thies" or "claimant") complaint seeking judicial review of the Commissioner of Social Security's ("Commissioner") decision denying him disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. For the reasons discussed below, the undersigned recommends that the case be **REVERSED** and **REMANDED** to the Commissioner to re-evaluate Thies's claim for disability insurance benefits in accordance with this opinion. ***See*** **42 U.S.C. §405(g).**

## FINDINGS OF FACT

### *Background Information*

Thies is now a fifty year old[1] male who has an associates degree in construction management (R. at 446).  He was employed as an iron worker for several years until 1987 when he fell off a ladder during work (R. at 28, 363, 449).  Thies was injured during the fall (R. at 51).  As a result of his injuries, he did not work for several years.  *See* R. at 51.  He had to undergo several surgeries to his left foot, left ankle and right knee (R. at 19, 28, 305,  306, 309, 319).  In 1995, Thies received a worker's compensation settlement, and he used those proceeds to start a steel erection company ("the company") (R. at 28, 102).

Because of his injuries, Thies could no longer do the same type of work he performed as an ironworker.  As an ironworker, he could lift as much as 100 pounds (R. at 449).  As a business owner,  he was only able to lift tools weighing less than ten pounds into the trucks his employees used to transport materials (R. at 103, 464) His day-to-day activities included dispatching jobs, bidding for work and supervising ten to thirty-five employees. (R. at 103, 471).  Over time, however, the scope of Thies's pain spread beyond his ankle and knees, and he had chronic pain[2] throughout his body.  *See* R. at 225-228, 256, 257, 272, 278; *see generally* R. at 364-91.

In 1997, Dr. Robert J. Davidson became Thies's primary physician (T. at 438).  He treated Thies for peripheral neuropathy[3], fibromyalgia[4] and chronic pain; however, he could not

---

[1] Thies was 48 years old when he appeared before the Administrative Law Judge for his hearing.

[2] Chronic:  "Referring to a health-related state, lasting a long time." *Stedman's Medical Dictionary,* p. 376 ( 28th ed. 2006)

[3] Neuropathy:  A classic term for any disorder affecting any segment of the nervous system.  In contemporary usage, a disease involving the cranial nerves or the peripheral or autonomic nervous system. *Id.* at 1313.

2

determine the cause of Thies's condition (*See* R. at 364-91).   Consequently, Dr. Davidson referred Thies to several specialists[5] and other physicians to help diagnose and treat Thies's pain. *See id*. Dr. Davidson also regularly prescribed medication such as OxyContin,[6] Percocet[7] Vicodin and Soma (a muscle relaxer) to help with Thies's pain. [8]*Id.* Eventually Thies became depressed and could not sleep and Dr. Davidson prescribed him Xanax, an anti-anxiety medication. *Id.*

As early as 1999, Dr. Davidson and Thies's family members realized that Thies was addicted to his pain medication. *See* R. at 260, 269.   For example, Dr. Davidson sought assistance from the Mayo Clinic's Spine Center asking if Thies could be treated there (R. at 269). He wrote a letter explaining Thies's "pain continues and his use of narcotics increases, with no known etiology found at this point." *Id.* The record further shows that on one occasion, Thies's family members told an emergency room doctor that although they knew Thies was in pain, they were concerned about his excessive consumption of pain medication (R. at 260).   Based on the suggestion of Dr. Davidson, Thies went to a pain clinic that administered Trigger Point

---

[4] Fibromyalgia:  "A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." It is "a disorder of unknown cause characterized by chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips which is aggravated by the use of the affected muscles." *Id.* at 725.

[5] A review of the medical records dated 1997 and beyond show that Dr. Davidson either referred Thies to the specialists who examined him, or the specialists sent Dr. Davidson a carbon copy of the records of their examination.

[6] OxyContin is a painkiller which treats moderate to severe pain that is expected to last for an extended period of time.   There is a risk of abuse or addiction in using this medicine. *Physician's Desk Reference*, p. 2705 (61st ed. 2007).

[7] Percocet is indicated for the relief of moderate to moderately severe pain.   Its principal ingredient is oxycodone which can produce drug dependence. *Id.* at 1131.

[8] Vicodin is used for the relief of moderate to moderately severe pain. Psychic dependence, physical dependence, and tolerance may develop upon repeated administration. *Id.* at 535-36.

Injection[9], and he went to a pain management clinic in 2003. *See* R. at 236. Thies was eventually kicked out of that pain management clinic for obtaining pain medication from several pharmacies in violation of the clinic's rules. (R. at 229, 236).

Although Thies continued to run his company throughout 2003, he was still experiencing pain as a result of his impairments. He continued to see Dr. Davidson for treatment, frequently visited emergency rooms, and went to an acupuncturist for his pain. *See generally* R. at 364-91; R. at 256-57. In 2004, Thies began to see Dr. Julius Cline, a psychiatrist for depression (R .at 393-400). Although Thies's business was profitable, Thies's impairments caused him to stop running his company in March of 2004 (R. at 465, 470).

On August 10, 2004, Thies applied for disability insurance benefits (R. at 16). His claim was denied initially and upon reconsideration in 2005. *Id.* On January 9, 2008, the Administrative Law Judge ("ALJ") held a hearing. *Id.* Thies, who was represented by counsel, testified and a vocational expert appeared. *Id.*

**Summary of Medical Records**

   **A. Dr. Lawrence G. Evans, Jr., REH Orthopedic, Inc.**

Dr. Evans examined claimant for the first time on August 24, 1988, to address the pain claimant was experiencing as a result of the fall (R. at 305-06). He performed several operations on Thies's foot and left ankle, and, in 1992, operated on his right knee (R. 18, 306, 309, 319 (noting several operations)); *see* R. at 300-338. He continued to treat claimant for the next

---

[9] Trigger Point Injection (TPI) is used to treat extremely painful areas of muscle and to alleviate myofacial pain syndrome (chronic pain involving tissue that surrounds muscle) *See* http://www.neurologychannel.com The procedure requires a physician to insert a small needle into the trigger point, which is a "knot or tight, ropy band of muscle that forms when the muscle fails to relax." *Id.*

couple of years and prescribed him Ibuprofen, Motrin, Darvocet[10] and Tylenol for pain.  (R. at 314, 322, 332, 335).  In 1991, Dr. Evans prescribed Thies Vicodin (R. at 314).

Dr. Evans's opinion was that claimant could perform only "sit down work," could no longer work as an iron worker, and could not walk or stand for a "prolonged" amount of time because of the lack of mobility in his subtalar joint (R. at 332, 334, 362).  He further noted that claimant will continue to have pain because of "degenerative changes" (R. at 334).

### B.  *Unknown Doctor, signature illegible*  (1994-1997)

This doctor appears to have treated Thies at various times from January 1994 through January 1997 (R. at 296-299).   Thies complained of pain in his left ankle and foot, right knee, wrists, and arms. *Id.* He was diagnosed with degenerative arthritis and impingement syndrome and was prescribed Darvocet for the pain. *Id.*

### C.  *Dr. Robert J. Davison, Medical Arts*

Dr. Davidson has been claimant's primary treating physician since 1997.  He has treated claimant throughout the years for peripheral neuropathy, fibromyalgia and chronic pain.  *See* (R. at 364-91).   Dr. Davidson regularly prescribed claimant medication for pain and anxiety such as Oxycontin, Percocet, Soma, Vicodin and Xanex. *Id.*  In addition, Dr. Davidson referred claimant to several physicians and specialists for treatment.   As early as 1999, Dr. Davidson recognized Thies  demonstrated the potential of becoming addicted to pain medication.  For example, on August 16, 1999, Dr. Davidson wrote to the Mayo Clinic's Spine Center requesting an evaluation of Thies for his "long-standing history of chronic low back pain and an approximately

---

[10] Darvocet:   A narcotic drug indicated for relief of mild to moderate pain, which has the potential for addiction. *Physician's Desk Reference,* p. 509 (57th ed. 2003).

1 and ½ year history of paresthesia[11] and dysesthetic[12] pain of both feet and hands" (R. at 269). Dr. Davidson noted in this letter that Thies's "pain continues and use of narcotic increases, with no known etiology found at this point." (R. at 269).

On January 8, 2008, Dr. Davidson completed a form in which he wrote his opinion about claimant (R. at 180-184). He opined Thies was in "daily constant" pain, and that he could not work any hours in an eight hour day. *Id.* He also reported that Thies had difficulty concentrating due to the medication.

### D. Dr. Burr, Radiology, Pinckneyville Community Hospital

Dr. Burr performed an x-ray exam of claimant's thoracic spine on June 12, 1997, and on January 8, 1998 he performed an x-ray on claimant's back (R. at 294-95). The January 12, 1997 x-ray showed "very minimal mid and upper level anterior hypertrophic sparring." (R. at 295). The January 8, 1998 x-ray of claimant's back "showed no evidence of fracture, subluxation, destruction, spondyloysis, disc space narrowing or SI joint abnormality" (R. at 294).

### E. Dr. James Goldring, Pinckneyville Community Hospital, Neurology Clinic

Dr. Goldring examined claimant on January 22, 1998, February 5, 1998 and May 14, 1998 (R. at 289-291). He diagnosed him with having "a sensory demyelinating neuropathy," performed nerve conduction studies, and recommended that he see specialists at Washington University Medical Center. *See id.*

---

[11] Paresthesia: A spontaneous abnormal usually nonpainful sensation . . . may be due to lesions of both the central and peripheral nervous system. *Stedman's Medical Dictionary*, p. 1425 (28th ed. 2006).

[12] Dysesthesia: A condition in which a disagreeable sensation is produced by ordinary stimuli; caused by lesions of the sensory pathways, peripheral or central. *Id.* at 596.

**F. Dr. Glenn Lopate, M.D., Washington University Neuromuscular Division**

Dr. Lopate examined claimant on July 16, 1998, September 17, 1998, January 28, 1999 and on July 15, 1999, for complaints of pain in his back, and numbness in hands and feet (R. at 276-81). Dr. Lopate noted claimant's examinations revealed finger muscle weakness, but noted his examinations were generally "unremarkable" and did not reveal any "clear weakness in the lower extremities" (R. at 270, 276).  On October 6, 1998, he conducted an MRI of claimant's spine (R. at 277).  The MRI of claimant's spine showed a "small disc bulge . . . without significant nerve root compression." (R. at 276).  Based on the examinations and MRI, Dr. Lopate concluded claimant had mild carpal tunnel syndrome (right) and "chronic pain of unknown etiology"  based on "relatively normal nerve conduction studies and imaging of lumbosacral spine." (R. 272, 278).  Dr. Lopate additionally noted that claimant was consuming 10-12 beers per day and that he discussed at length claimant's need to avoid narcotics (R. at 270, 272).  During this time claimant was taking Neurontin[13], Vicodin, and extra strength Tylenol. *Id.* Dr. Lopate planned to work towards "getting him off Vicodin as soon as possible" (R. at 270, 271).

**G. Dr. Al-Lozi, Washington University School of Medicine Department of Neurology**

Dr. Al-Lozi examined claimant on July 16, 1998 after he was referred to him by Dr. Lopate, G. (R. at 284-85).  He ruled out claimant having peripheral polyneuropathy but diagnosed him with having mild right carpal tunnel syndrome. *Id.*

---

[13] Neurontin is indicated for the management of postherpetic neuralgia (painful condition of the nerves) in adults. *Physician's Desk Reference,* p. 2489 (61st ed. 2007)

### H.   Dr. David M. Peeples, Neurological and Electrodiagnostic Institute, Inc. of St. Louis

On April 27, 1999, Dr. Peeples conducted a neurology evaluation on claimant (R. at 273-74).  Claimant wanted a second opinion about "symptoms of [a] one year history of parastehias and dysesthetic pain in both feet and hands." *Id.* Dr. Peeples determined claimant had mild peripheral neuropathy and chronic symptoms suggestive of peripheral neuropathic pain. *Id.*  He prescribed claimant Neurontin and recommended he undergo a nerve biopsy. *Id.* It was his opinion that "it is not unusual to have idiopathic neuropathies with no specific diagnoses . . . ."*Id.*

### I.   Dr. Todd D. Devine, Phoenix Neurological Associates, LTD.

On October 19, 1999, Dr. Devine examined claimant for complaints of pain in his muscles and joints that were "so severe that he will have to stay in bed for three or four days until it resolves." *See* R. at 261-64; 265-67.  Dr. Devine noted that there was "no evidence of radiographic abnormality" in claimant's wrist or left elbow. *Id.* "Impingement Syndrome" existed in left shoulder but his exam of claimant's shoulder did not reveal any evidence of a fracture or other acute injury. *Id.*  Dr. Devine concluded that claimant's muscle and joint problem could be an "arthritic disease" consistent with either a "metabolic myopathy or fasciitis[14]" (R. at 266).  He also believed there was a significant degree of muscle spasm present in claimant's paraspinous muscles that contributed to claimant's pain. *Id.* When Dr. Devine examined claimant, he was taking Vicodin and Neurontin for pain (R. at 267).  Dr. Devine prescribed claimant Baclofen (muscle relaxer) for pain and he recommended claimant undergo a muscle biopsy (R. at 267).

---

[14] Fasciitis: Inflammation in fascia (sheet of fibrous tissue that encloses muscles).  *Stedman's Medical Dictionary,* pp. 700, 707 (28th ed. 2006). Myopathy: Any abnormal condition or disease of the muscular tissues; commonly designates a disorder involving skeletal muscle." *Id.* at 1274.

### J.  Dr. Edwin Dunteman, Missouri Bone and Joint Center

Dr. Dunteman examined claimant in February of 2000 to address claimant's complaints of hand, foot and back pain (R. at 258-59).  He did not find any gross deformity in Thies's back. *Id.* Additionally, he noted that Thies's reflexes were intact "as were strength and sensation for upper and lower extremities." *Id.* Dr. Dunteman found evidence of myofascial pain to explain claimant's lower back pain and noted there was a possibility of "degenerative spine disease." *Id.* He further found claimant was potentially abusing opiods and recommended claimant go to a pain psychologist "to determine behavior factors that are impacting on his pain behavior." *Id.*

### K.  Ying Li, Acupuncturist, Southern Illinois Acupuncture

On March 23, 2001, Ying Li, an acupuncturist, provided acupuncture services for claimant's chronic pain (R. at 256-57).

### L.  Pinckneyville Community Hospital, Emergency Room

On November 11, 1999, claimant went to Pinckneyville Community Hospital's ("PCH") emergency room where he complained that he had pain throughout his body (R. at 260). Claimant's family members were with him, and while they did not doubt he was in pain, they told the physician they believed the amount of medication he took was excessive, and that they were particularly concerned because he drank alcohol. *Id.* Claimant was taking Vicodin six to eight times per day. *Id.* The physician noted claimant had neuropathy but that his examination failed to reveal anything "remarkable."  He advised him to stop drinking and recommended he go to a pain management clinic. *Id.*

On July 11, 2003, claimant went to PCH's emergency room because Dr. Davidson was on vacation (R. at 247).  The physician determined claimant had generalized chronic pain and a history of fibromyalgia; however, his extremities failed to reveal any abnormality. *Id.*  He further

noted claimant was anxious to get a refill of OxyContin and that there was "possible dependency on narcotic analgesics." *Id.*

### M.  Donald E. Henson, Ph.D.

Dr. Henson did not examine Thies.  On December 18, 2004, he filled out a mental residual functional capacity assessment and a psychiatric review forms after reviewing claimant's records (R at 193-196; R. at 197-204). He noted claimant's "cognitive attentional and functional abilities are adequate for performing simple routine activities, his interpersonal skills are generally appropriate for vocational involvement, and he was capable of simple routine activities" (R. at 195).  He additionally found that due to claimant's symptoms of depression, he "would have problems satisfactorily performing detailed activities of a somewhat complicated nature." *Id.* Moreover, claimant was moderately limited in carrying out detailed instructions, performing activities within a schedule, and maintaining regular attendance (R. at 193).  Dr. Henson's notes also stated claimant had a history of psychiatric hospitalization and continues in outpatient psychiatric treatment in which he is prescribed Paxil and Wellbutrin for major depression (R. at 203).

### N.  Harry J. Deppe, Ph.D., Clinical Psychologist

Dr. Deppe performed a psychological examination on Thies on November 8, 2004 (R. at 205-208).  He noted Thies was treated for depression on an inpatient basis in 2003 (R. at 206). He noted claimant was currently under the care of psychiatrist and had fibromyalgia, polysubstance abuse and a single episode of major depression (R. at 207).   His clinical impression was that claimant's ability to relate to others, including fellow workers and supervisors was intact (R. at 207).  Claimant received a "fair" rating from Dr. Deppe in the following areas: his ability to understand and follow simple instructions, his ability to maintain

10

attention required to perform simple, repetitive tasks, and his ability to withstand the stress and pressures associated with a day-today work activity (R. at 207).

### O.  Vittal V. Chapa, M.D.

Dr. Chapa examined claimant for 28 minutes on November 8, 2004.  *See* R. at 209-211.  He noted claimant has a history of fibromyalgia, diffuse body pains and muscle pains and gives a history of neuropathy (R. at 211).   He further indicated claimant "has no difficult with ambulation . . . and can perform both fine and gross manipulations with both hands" (R. at 211).

### P.  Dr. Julius S. Clyne,

Dr. Cline,  a psychiatrist, treated claimant for major depression several times in 2004 (R. at 393-400).  He described Thies as "agitated" and noted he had a hard time sleeping. *Id.* He prescribed him Paxil and Wellbutrin. *Id.*

### Q.  Dr. Gregory C. Randle, Vivace —The Good Life Center

Dr. Randle treated claimant for back pain and tried to help him with managing his pain from October 2003 through January 5, 2005 (R. at 229). *Id.* Dr. Randle noted that claimant had "recurrent depression,"  fibromyalgia and degeneration disc disease, and, he also had "significant psycho-stressors which may be contributing to his whole back pain" (R. at 236-240).  Dr. Randle additionally prescribed claimant with Ambien for his insomnia and scheduled him for trigger point injections and myofascial release (application of pressure on soft tissues) (R. at 237-239). Claimant was discharged from the pain management program after Dr. Randle's staff discovered that claimant had been going to a number of different pharmacies to receive pain medication prescribed by various physicians (R. at 229).

11

### R.  Dr. Oh B. Rock

On December 20, 2004, Dr. Rock reviewed Thies's records and found that claimant's impairments were "non-severe" (R. at 192).

### S.  Chesterfield Memorial Hospital Records

On August 23, 2003, Thies had an MRI of his lumbar spine.  Dr. Sally Ballard, PA-C noted "mild degenerative spondylopathy may be significant at the L5-S1 level where there may be low grade impingement on the right L5 nerve root." (R. at 428).

On April 6, 2004, an examination of Thies's right foot was conducted after Thies was injured in a fall.  There was "marked lateral soft tissue swelling but no fracture appreciated." (R. at 422). "Examination of the right foot fails to reveal evidence of joint space narrowing, fracture, subluxation of other bone or joint pathology." *Id.*  "No evidence of radiographic abnormality." *Id.*

On August 29, 2004,  Thies went to the hospital's emergency department complaining of "pain all of the time." Final diagnoses:  pain related to fibromyalgia.   Thies was prescribed Toradol (R. at 419-20).

On November 7, 2004, Thies went to the hospital's emergency room complaining of "pain all over."  Dr. John Turk prescribed him with Toradol and diagnosed him with musckoskeletal pain.  (R. at 406-409).

On December 29, 2004, Thies went to the hospital's emergency room complaining about back pain and that he ran out of his medication (R. at 402-405). He was prescribed Vicodin and Toradol for chronic pain syndrome.

On March 11, 2005, Thies complained about pain in his left arm, knee, hip, neck and restless sleeping.  He was diagnosed as oxycontin dependent (R. at 219-223).

On April 3, 2005, Thies went to the hospital's emergency room complaining about pain and stating he ran out of OxyContin. (R. at 215-218).

### *Hearing Testimony*

During the hearing, the ALJ asked Thies to describe an average day (R. at 445-57). Thies stated he gets out of bed between 9:30 a.m. and 10:00 a.m., spends most of his day sitting down, and goes to bed at approximately 9:00 at night (R. at 455-57). He cooks frozen meals for himself, does his own laundry, and loads/unloads the dishwasher (R. at 456, 458). Thies has an aunt who checks on him daily and manages his money (R. at 458, 460).

Thies testified that his back hurts eighty per cent of the time and the level of pain depends on whether the pain medication he takes has worn off (R. at 450). On a scale from zero (no pain) and ten (worst pain imaginable), he stated his pain is at level seven or eight when his pain medication wears off, and it drops to a level two or three once he takes the medication. *Id.* He testified that he usually takes his pain medicine before he gets out of bed. *Id.* Thies advised the ALJ he tried unconventional "treatments" such as acupuncture, massage therapy, and a mattress with magnets in it to help with his pain (R. at 451). Thies testified that his fingers hurt, his neuropathy made his hands, feet, legs, and arms go "numb" and that he wears a knee brace at night (R. at 453, 457, 467). On a good day, Thies stated he could sit for 2-3 hours, and that it hurt him to stand (R. at 461). In addition, his fibromyalgia prevented him from sleeping at night and he was diagnosed with sleep apnea (R. at 468).

The ALJ asked Thies whether the pain medicine he took caused any side effects for him (R. at 453-454). He replied that Lyrica made him dizzy and the high dose of OxyContin made him "loopy" (R. at 454). He told the ALJ that there was a time when he could not control his pain medicine well, but he had learned to control it better (R. at 43).

In response to a question about whether Thies had any emotional problems that would affect his ability to work, Thies replied that he did not know if they would or not because he "couldn't work because of [his] physical abilities, so [he couldn't] tell if [his] emotions would hinder his work or not" (R. at 455). He advised the ALJ he took medication for depression, and that he used to go to a psychiatrist, but he could no longer afford to go (R. at 454-455). He also testified that he spent some time in a "mental ward" and that his psychiatrist told him that he should not work   (R. at 453, 463).   Thies believed that his memory and his inability to concentrate would affect any work requiring him to sit down most of the day (R. at 466).

Thies additionally testified he lost his home and now lives in a metal building where he used to run his company (R. at 455).  He stated he loved running his company, and that it made a minimum of $62,000 a year; however, he had to stop running it because his pain prevented him from getting out of the bed every day, he could not concentrate, and he could no longer run his company properly (R. at 465, 470).

The Vocational Expert ("VE") testified that the work Thies did as a business owner was managerial "light, skilled work" which was not transferable to other work   (R. at 472).  The ALJ posed a hypothetical to the VE, asking him to give his opinion about the availability of jobs for a hypothetical person that had the same age, education, and work history as Thies.  *Id.* This person could occasionally sit for six hours in an eight hour day, stand/walk for two hours in an eight hour day, occasionally push/pull with the upper and lower extremities and could perform simple, repetitive tasks, [with] occasional contact with co-workers, supervisors, and the public (R. at 473). The VE answered there were not many jobs available in the regional or national economy that this person could do. *Id.* The ALJ did not ask the VE any questions about the type of work this hypothetical person could perform if he had been diagnosed with depression.

14

The ALJ then slightly changed the hypothetical and asked about the availability of jobs if this same person could *frequently* push/pull with his upper and lower extremities (R. at 474). The VE responded that there would be 250 jobs for hand packaging, 8200 jobs for assembly work, 1800 jobs for production inspection (R. at 474). The conversation then proceeded as follows:

> Q (ALJ): If that same person can only *occasionally* push/pull with the upper extremities, there would be no jobs?
> A (VE): Very small number, Yes.
> Q (ALJ): And if a person could sit for less than six hours in an eight hour day, stand/walk for less than two hours in an eight hour day, would there be any jobs?
> A (VE): I think there would be – the vocational base would be very seriously eroded; there'd be no work.

(R. 474-475). The VE additionally explained if the person's neuropathy affected the hypothetical person so that it prevented him from using his hands frequently, then he would not be able to sustain the hand packaging, assembly line, and production inspection jobs previously discussed (R. at 475-76). In providing his opinion, the VE explained he did not review all of the medical evidence in Thies's file; however, he primarily focused on the vocational evidence (R. at 475).

### *The ALJ's Decision*

On November 19, 2008, the ALJ concluded Thies was not disabled[15] by using the following standard five-step inquiry, which required him to determine:

(1)     Whether the claimant is currently employed;
(2)     Whether the claimant has a severe impairment;
(3)     Whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]
(4)     Whether the claimant can perform her past work;

---

[15] A person is "disabled" when does not have "an ability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has last or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

(5)     Whether the claimant is capable of performing work in the national economy.

***Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000); 20 C.F.R. §404.1520.**   The ALJ initially determined that Thies met the "insured status requirements" of the Social Security Administration through December 31, 2009. *See* R. at 18-25. Under step (1), the ALJ determined that Thies had not engaged in "substantial gainful activity" since March 31, 2004.  Under step (2), the ALJ found that claimant has the following severe impairments (a) displaced peroneal tendons of the left ankle, status post surgery; (b) ossicle left ankle, status post surgery; (c) degenerative arthritis of the left foot, status post surgery; (d) torn meniscus of the right knee, status post surgery; (e) left shoulder impingement, (f) fibromyalgia; (g) obesity, (h) sleep apnea (i) peripheral neuropathy of the feet and hands; (j) depression and (k) substance abuse. *Id.* The ALJ further found that claimant has carpel tunnel syndrome but found this was not a severe impairment.   Under step (3), the ALJ found that claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Under steps (4) and (5) the ALJ found that claimant cannot perform any past relevant work, but that he has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except that claimant:

- can only *frequently* push/pull with his upper and lower extremities;
- never climb ladders, ropes or scaffolds or kneel or crawl although he can perform all other postural activities occasionally;
- must avoid all hazards;
- is  limited to the performance of simple, repetitive tasks with only occasional contact with the public, coworkers, and supervisors.

*See* R. at 18-25 (emphasis added).   In determining Thies was not disabled, the ALJ rejected Thies's treating physician's opinion that Thies's impairments prevented him from working at all,

16

and additionally found Thies exaggerated the severity of his pain. *Id.*  Thies seeks an order reversing the ALJ's decision, arguing the ALJ erred by (1) making an adverse credibility determination about Thies's own account of the severity of his pain; (2) refusing to give any weight to Dr. Davidson's opinion; (3) and by improperly assessing Thies's mental impairments. For the following reasons, the undersigned agrees with Thies on all three points.

### *Analysis*

A court's review of the Social Security Administration's decision to deny disability benefits is limited to determining whether the decision is supported by substantial evidence in the record.  ***Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003); *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000); *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007).** "Evidence counts as substantial so long as it is sufficient for a reasonable person to accept as adequate to support the decision." ***Ketelboeter v. Astrue,* 550 F.3d 620, 624 (7th Cir. 2008)** (***citing Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003) (internal citations and quotations omitted).**  "In [a] substantial evidence determination, [courts] review the entire administrative record[16], but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." ***Clifford,* 227 F.3d at 869.**  "However, that does not mean [this Court] will simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Id.*

---

[16] The Commissioner claims, without citing any authority, that claimant cannot demonstrate he is disabled with medical records that pre-date 2000 (Doc. 18) despite the fact that the ALJ relied on these records in making his findings of fact.  The Court rejects the Commissioner's argument as the Court must evaluate *all* of the evidence in Thies's record.

1. **The ALJ's Credibility Determination Rejecting Claimant's Own Statements About the Intensity, Persistence and Limiting Effects of his Pain Was Not Based on Substantial Evidence in the Record And Was Not Made In Accordance with the Social Security Administration's Regulations**

Administrative Law Judges deciding whether to award benefits to someone whose disability determination hinges on their "pain" have an arduous task.  *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).  While "[m]edical science confirms that pain can be severe and disabling even in the absence of objective medical findings," there are those, knowing this, who will exaggerate their pain to receive benefits. *Id.*  The ALJ here determined Thies's medical impairments could be expected to produce his symptoms; however, he found Thies's statements concerning the "intensity, persistence and limiting effects of [his] symptoms" were not credible and found (1) the objective evidence of record did not "fully support" Thies's allegations since, in spite of all of his impairments, Thies was able to work as a steelworker until March 31, 2004 and (2) Thies reports pain in order to receive narcotic pain medication (R. at 22).

Since the ALJ is in the best position to evaluate a plaintiff's credibility, his credibility findings are "entitled to considerable deference." *Simila, v. Astrue,* **573 F.3d 503, 517 (7th Cir. 2009).  *Pochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006)**; *See Dixon v. Massanari,* **270 F.3d 1171, 1176-77 (7th Cir. 2001); *Terry v. Astrue,* 580 F.3d 471 (7th Cir. 2009); *Carradine,* 360 F.3d at 753-74.**  Credibility determinations will not be disturbed unless they are "patently wrong. " *Eichstadt v. Astrue,* **534 F.3d 663, 668 (7th Cir. 2008) (citing *Jens,* 347 F.3d at 213).** However, an "ALJ must consider the *entire case record* and give specific reasons for the weight given to the individual's statements" when making credibility determinations. *Simila,* **573 F.3d at 517 (emphasis added).**  Consequently, if the ALJ's credibility determinations rested on "serious errors," the case must be remanded**. *Clifford,*  227 F.3d at 872; *Ramsey v. Astrue,* 319 Fed. Appx. 426, 428 (7th Cir. Apr. 1, 2009) (*citing Carradine,* 360 F.3d at 754.)** For the

18

following reasons, remand is required here because the ALJ's credibility evaluation was based on partial or inaccurate evidence and was not made in accordance with the Social Security regulations.

First, it was improper for the ALJ to discredit Thies's statements about the severity of his pain because the objective evidence failed to "fully" support his allegations. *See* R. at 22. The ALJ had already determined that Thies had multiple severe impairments. Medical records dating from 1999 to 2004 show, for example,  Thies had fibromyalgia, mild degenerative spondylopathy and generalized chronic pain (R. at 346-91, R. at 428). While some of Thies's medical records fail to show significant abnormalities, "once a claimant produces medical evidence of an underlying impairment, the [ALJ] may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." ***See Carradine,* 360 F.3d at 753 (noting [a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability.   Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence.")** The social security regulations specifically state the administration will not "reject [a claimant's statements] about the intensity and persistence of [his] pain or other symptoms or about the effect [the] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." **20 C.F.R. § 404.1529(c)(1)(2).** Moreover, the ALJ relied on his incorrect belief that Thies performed heavy work as a steel/iron worker until 2004 in spite of all of his severe impairments. However, Thies could no longer work as a steel worker because of the injuries he sustained. He owned his own business from 1995-2004, and the work he performed there was classified as "light" skilled work from 1995-2004 (R. at 472).

Second, the ALJ's finding that Thies "reports pain in order to receive pain medication" was based on part of the record — the part that shows Thies became addicted to his pain medication. The ALJ specifically noted Thies was discharged from a pain medication clinic for obtaining medication from a number of pharmacies. The Court acknowledges Thies's decision to violate the pain clinic's rules provided the ALJ with good reason to question Thies's credibility. *See Simila,* **573 F.3d at 519-20.** "But no matter how fishy a claim for Social Security benefits might seem, an ALJ must follow the same rules for every case. She must refrain from playing doctor, properly evaluate the medical evidence and the [claimant's] credibility, and accurately incorporate the [claimant's] limitations used to elicit the opinion of a vocational expert." *Id.* **at 507.** Here, the ALJ made an adverse credibility determination without considering evidence in the record that corroborated Thies's statements about the intensity of his pain.

Social Security Ruling 96-7(p) ("SSR 96-7p") governs how administrative law judges should assess a claimant's own statements about his symptoms. **SSR 96-7p**; *Simila,* **573 F.3d at 517;** *See* **20 C.F.R. §404.1529(c)(3).** This policy requires administrative law judges to consider (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) *the type, dosage, effectiveness, and side effects of any medications the individual takes or has taken to alleviate pain or other symptoms*; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measure other than treatment the individual uses or has used to relieve pain or symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* (emphasis added). ***See* also** *Myles v. Astrue,* **582 F.3d 672, 677 (7ᵗʰ Cir. 2009); ** *Brindisi v. Barnhart,* **315 F.3d 783, 787 (7ᵗʰ Cir. 2003);** *Boyd v. Barnhart,* **2006 WL 906635, \*\*3 (7ᵗʰ Cir. Mar. 30, 2006);** *Ramsey,* **319 Fed. Appx. At 429.**

      The ALJ noted Thies could lift a gallon of milk occasionally, sit 2-3 hours on a good day, and not drive more than 10 miles a time. However, these activities are not necessarily inconsistent with his testimony that he is in constant pain. ***Carradine,* 360 F.3d at 755-56 (noting that a person who can drive for a little while, do housework and shop when they feel better does not mean they can work eight hours a day five days a week);** *see also Shramek v. Apfel,* **226 F.3d 809, 813 (7ᵗʰ Cir. 2000);** *Zurawski v. Halter,* **245 F.3d 881, 887 (7ᵗʰ Cir. 2001).**

      What is more significant is the ALJ relied on Thies's desire to take pain medication without considering the "type" of pain medication Thies was regularly prescribed, or its "dosage," "effectiveness" or "side effects." **20 C.F.R. §404.1529(c)(3); SSR 96-7(p).** There was no discussion about the fact that physicians consistently prescribed Thies medication which could potentially be "habit forming," or that Thies had been seeking treatment for his pain for several years while taking his medicine, but did not stop working at a profitable business until 2004. The ALJ further failed to consider Thies tried alternative treatments to ease his pain such as acupuncture, trigger points, and myofascial release, or the measures Thies took while he was at home (e.g. purchasing a special mattress). The ALJ's finding that Thies exaggerated his pain rested solely on part of the record — which showed that Thies had become addicted to his pain medication. But the ALJ was required to address evidence that weighed in Thies's favor, and explain why it was rejected. *Indoranto v. Barnhart,* **374 F.3d 470, 474 (7th Cir. 2004).** A credibility finding made without considering factors that could corroborate the claimant's

statements about the severity of his pain is improper. *See Gaylor v. Astrue,* **2008 WL 4206360, **1, **6-8 (7th Cir. Sept. 8, 2008) (finding ALJ made an unsupported credibility determination rejecting the claimant's account of the severity of his pain by relying on evidence regarding pain medication dependency without acknowledging evidence that corroborated claimant's statements about his pain. "[T]he ALJ's willingness to accept that [claimant] exaggerated his pain or was addicted to his medication relied on only "half the evidence . . . ." ); *See Stebbins v. Barnhart,* 2003 WL 23200371, *12 (W. D. Wis. Oct. 21, 2003) (finding ALJ's credibility determination that was based on plaintiff's pain addiction was improper when he failed to examine the plaintiff's medication, potential side effects, or the degree to which they were effective in reducing the pain); *see also Cline v. Barnhart,* 2002 WL 31242223, *7 (S.D. Ind. Aug. 16, 2002) (finding the ALJ failed to properly address plaintiff's regime of taking multiple, habit forming pain medication to decrease his pain because "the necessity of powerful pain relievers in order to obtain pain relief is a strong indicator that the claimant experiences severe, debilitating pain.")**  Consequently, the case should be remanded so the ALJ can determine whether Thies is disabled in accordance with the Social Security's own regulations. *Terry,* **580 F.3d at 476 ("[a]n agency is bound by its own regulations.)"**

2.   **The ALJ's Decision to Reject Thies's Treating Physician's Opinion Was Not Based on Substantial Evidence in the Record and Was Not Made In Accordance With the Social Security Administration's Regulations**

The ALJ's belief that Thies exaggerated his pain was also the reason he discredited Dr. Davison's opinion about how Thies's impairments affected his ability to work.  Dr. Davison's opinion was Thies lives with "severe, daily, constant pain"  in his neck, legs and lower back, has confusion and difficulty concentrating and could not engage in repetitive pushing/pulling or fine

manipulation with either hand." (R. at 180-84).  Consequently, Dr. Davidson determined Thies

cannot work any hours in an eight hour work day. *Id.*

 The ALJ rejected his conclusion and stated:

> The undersigned does not give weight to Dr. Davidson's opinion.
> There is no objective evidence supporting the extreme limitations
> assign the claimant by Dr. Davidson.  *These limitations appear to
> be based on the claimant's subjective complaints of pain.*
> However, as indicated above, there is a strong likelihood that the
> claimant's complaints of pain are motivated by a desire for
> narcotic pain medications and, therefore, cannot be trusted as an
> indicator of his medical condition.

(R. at 23) (emphasis added).   Thies argues this credibility determination cannot stand because it

is not supported by substantial evidence, and the ALJ failed to point to any conflicting medical

opinion in making this credibility determination (Doc. 15).

"An ALJ can reject a treating physician's opinion only for reasons supported by

substantial evidence in the record; a contradictory opinion of a non-examining physician does

not, by itself, suffice." **Gudgel, 345 F.3d at 470;** *see* **20 C.F.R. §404.1527 (generally requiring**

**an ALJ to give more weight to the opinion of a claimant's treating[17] physician).** "More

weight is given to the opinion of treating physicians because of their great familiarity with the

claimant's conditions and circumstances. *Id.* "The treating physician's opinion is important

because that doctor has been able to observe the claimant over an extended period of time, but it

may also be unreliable if the doctor is sympathetic with the patient and thus too quickly find

---

[17] Treating source means [the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §404.1502."Nontreating source means a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* "Nonexamining source means a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [his or her] case." *Id.*

disability." *Ketelboeter,* **550 F.3d at 625;** *Schmidt,* **201 F.3d at 972.**  "The patient's regular physician may want to do a favor for a friend and a client, and so the treating physician may too quickly find disability."  *Books v. Chater,* **91 F.3d 972, 979 (7th Cir. 1996).** "The ability to consider bias, however, is not synonymous with the ability to blithely reject a treating physician's opinion or to discount that treating physician's opinion's opportunity to have observed the claimant over a long period of time." *Micus v. Bowen,* **979 F.2d 602, 609 (7th Cir. 1992).** Consequently, if an ALJ chooses not to give the claimant's treating physician's opinion "controlling weight," then he must consider factors such as the length of the treatment relationship and the frequency of his examinations; the nature and extent of the treatment relationship, which includes a consideration of the "extent of examinations and testing the source has performed or ordered from specialists and independent laboratories"; the physician's specialties, and "other factors" of which the ALJ is aware. **20 C.F.R. §404.1527(d)(2)(i)(ii)(3)-(6).** The regulations further require ALJ's to generally give "more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." *Id.* **at (d)(1).** When deciding what weight to give to the opinions of a non-examining source, the ALJ must keep in mind that "nonexamining sources have no examining or treating relationship with [the claimant]." *Id.* **at (d)(3).** Consequently, the weight that is given to the opinion of a physician who has not examined the claimant must "depend on the degree to which they provide supporting explanations for their opinions." *Id.*

The ALJ discussed the "opinion evidence" of two non-examining physicians when he determined Thies's residual functional capacity (R. at 22-23). Dr. Rock[18] found that Thies's impairments were not severe; therefore, the ALJ rejected his opinion since the ALJ found Thies

---

[18] The record contains a discrepancy regarding this doctor's name.  The Court is unclear if his name is Dr. B. Rock Oh, or if it is Dr. Oh B. Rock. *See* R. at 192; R. at 22.

had numerous severe impairments (R. at 192; R. at 22-23).  Dr. Henson is a psychologist who found that Thies could adequately perform "simple routine activities"; however, due to Thies's depression, he "would have problems satisfactorily performing detailed activities of a somewhat complicated nature." (R. at 193-196).  He further found he was "moderately limited in carrying out detailed instructions, performing activities within a schedule, and maintaining regular attendance." (R. at 193, 195).  The ALJ credited Dr. Henson's opinion to the extent that it was consistent with a finding that Thies would have "difficulty with semiskilled or skilled work" (R. at 23).

The Commissioner further argues the ALJ rejected Dr. Davidson's opinion by also relying on Dr.'s Chapa and Pasha's medical records (Doc. 18).  As previously noted, Dr. Chapa examined Thies for 28 minutes and noted he "had no problem with ambulation and could perform both fine and gross manipulation bilaterally" (R. at 211). In determining Thies had severe impairments, the ALJ noted Dr. Pasha found Thies had "possible dependency on narcotic analgesics" (R. at 19).

The undersigned finds the ALJ's credibility determination about Dr. Davidson's opinion was not supported by substantial evidence, and it was not made in accordance with the Social Security regulations.   The ALJ's finding that Dr. Davidson's opinion about Thies's limitations was based solely on Thies's complaints of pain is not supported by substantial evidence in the record.  Dr. Davidson has treated Thies since 1997. Before Dr. Davidson began treating Thies, one specialist determined that Thies's injuries would ultimately result in continuing pain because of "degenerative changes" (R. at 332, 334).  Moreover, Dr. Davidson's treatment of Thies's fibromyalgia, peripheral neuropathy and chronic pain included seeking out several specialists to examine Thies in hopes of determining the source of Thies's pain. *See* R. at 364-91. For

example, one specialist determined that it was not unusual for there to be no specific diagnosis for Thies's "chronic symptoms suggestive of peripheral neuropathic pain." (R. at 273-74). In 2000, another specialist stated there was evidence of myofascial pain (R. at 258-59 ). A  MRI taken in 2003 showed Thies had mild degenerative spondylopathy (R. at 428).

To address Thies's dependency on pain medication, Dr. Davidson referred Thies to people who could perform alternative forms of treatment and tried to help him better manage his pain.  For example, Thies went to an acupuncturist, had trigger point injections, and went to two pain management clinics (R. at 240, 256-57).   The ALJ simply failed to take into account the steps Dr. Davidson took to corroborate Thies's complaints of pain before rejecting his opinion concerning Thies's limitations. *See* **20 C.F.R. §404.1527(d)(2)(i)(ii)(3)-(6).**  There is substantial evidence in the record showing that Dr. Davidson's opinion was based on the information he received from the specialists who treated Thies throughout the years and not solely on Thies's subjective complaints of pain.

The ALJ also failed to comply with the requirements set forth in the social security regulations when he rejected Dr. Davidson's opinion.  The Seventh Circuit's decision in ***Moss v. Astrue,* 555 F.3d 556 (7th Cir. 2009)** is instructive.  *In Moss,* the Seventh Circuit remanded the case back to the Commissioner in part because the ALJ discounted a treating source's opinion about the claimant's injuries without following the Social Security's regulations. ***Id.* at 563**; **20 C.F.R. §404.1527.** The treating source had treated the claimant's injuries for over a year and described the claimant's range of motion as "quite limited." ***Id.* at 558.**  But the ALJ found the claimant was not disabled and could do sedentary work based on another physician's opinion stating the claimant had only "slight limitation." ***Id.*** While discussing the regulations, the Seventh Circuit noted "[i]f an ALJ does not give a treating physicians opinion controlling

26

weight, the regulations require the ALJ to consider the length, nature and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed and the consistency and supportability of the physician's opinion." *Id.* at 561 (*citing* **20 C.F.R. §404.1527(d)(2);** *Books,* **91 F.3d at 979.** It further determined the ALJ's "choice to accept one physician's opinion but not the other" without considering those factors was improper. *Id.* The court additionally found the conflict between the two physicians in *Moss* was illusory because the physicians had two different specialties and were evaluating different aspects of the claimant's injuries. *Id.* at 561.

In this case, the ALJ failed to specifically cite to any contradictory medical opinions when he rejected Dr. Davidson's opinion (R. at 23). *See Clifford,* **227 F.3d at 870** ("**An ALJ must not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in the record.);** *see also Scivally v. Sullivan,* **966 F.2d 1070, 1077 (7th Cir. 1992) (noting "in the absence of contradictory medical evidence, the ALJ impermissibly substitutes his own medical judgment for that of the physicians.")** However, a generous reading of the ALJ's findings shows he determined Thies's residual functioning capacity in part based on the opinions of Dr. Henson and Dr. Chapa.[19]   The problem here is the ALJ could not have reasonably relied on Dr. Henson's opinion in rejecting Dr. Davidson's opinion about Thies's physical limitations (e.g. "severe, constant pain") because Dr. Henson is a non-examining psychologist who gave his opinion about Thies's mental limitations (R. at 22-23).

---

[19]   As noted above, the ALJ rejected Dr. Rock's opinion evidence in its entirety. The Commissioner's argument that the ALJ relied on Dr. Pasha's medical records  is unsupported and will not be considered by the Court. The ALJ did not mention Dr. Pasha at all while determining Thies's residual functioning capacity. *See  Fuller v. Astrue,* **2010 WL 272877, \*10, n.2 (C.D. Ill. Jan. 15, 2010) (noting the ALJ's discussion of medical records at one step in the analysis does not excuse him from discussing them in other steps).**

Moreover, if, as the Commissioner states, the ALJ relied on Dr. Chapa's statement that Thies "had no problem with ambulation and could perform both fine and gross manipulation bilaterally," he still failed to consider the fact that Dr. Davidson had been treating Thies for eleven years at the time of the hearing as compared to Dr. Chapa's single twenty-eight minute examination.

A final issue that was not raised by the parties is the ALJ, when rejecting Dr. Davidson's opinion that Thies could only occasionally lift his arm over his shoulder, determined Thies could "*frequently*" push and pull with his upper and lower extremities. The ALJ made this finding after the VE explained there were very few jobs for people who could only *occasionally* push/pull with their upper and lower extremities (R. at 22-23). Yet the ALJ limited Thies to sedentary work because of the possibility that Thies's lower impairments "worsened over time" and his "degenerative disc disease" could cause him some pain. *Id.* These findings are inconsistent, "do not build a logical bridge between the evidence and his conclusion" and require an explanation that is supported by the record.[20] ***Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009).**

On remand, the ALJ must consider the factors delineated in 20 C.F.R. §404.1527, must *adequately explain* why Dr. Davidson's findings were inconsistent with other medical evidence in the record, and must support his determination that in spite of Thies's physical limitations, he can "frequently" use his upper and lower extremities. ***See Gudgel,* 345 F.3d at 470; *Moss,* 555 F.3d at 561.**

---

[20] The record shows the ALJ may have determined that Thies could *frequently* upper and lower extremities  based on an incorrect belief that Thies did heavy work as steel worker until March of 2004.

**3. The ALJ Improperly Evaluated Thies's Mental Impairments by Failing to Adequately Explain Why Thies Could Do Sedentary Work In Spite of his Depression and by Posing Flawed Hypotheticals to the Vocational Expert**

Thies's last argument is the ALJ improperly evaluated his mental impairments when deciding he was not disabled.  The ALJ listed "depression" as one of Thies's severe impairments (R. at 18).  He nevertheless  determined that his depression would not preclude him from doing sedentary work limited to "simple, repetitive tasks with only occasional contact with the public, coworkers and supervisors." (R. at 23). Thies contends the ALJ erred because he made this determination by crediting Dr. Henson's opinion over Dr. Deppe's opinion without providing a reason.

As previously noted, Dr. Henson served as a psychological consultant but did not examine Thies (R. at 23).  He completed a mental residual functional capacity assessment form noting Thies had a history of "psychiatric hospitalization" and was taking  Paxil and Wellbutrin for depression (R. at 193, 195).  He opinion was Thies was capable of performing simple, routine activities; however, he would have problems performing detailed, complicated activities and was also moderately limited in "carrying out detailed instructions, performing activities within a schedule, and maintaining regular attendance" (R. at 193, 195).

Dr. Deppe examined Thies one time (R. at 205-208).  He noted Thies was under the care of a psychiatrist, and Thies had only a "fair" ability to understand and follow simple directions, maintain attention to perform simple repetitive tasks and withstand the stress and pressures associated with a day-today work activity (R. at 207).

"An ALJ must articulate in a rational manner the reasons for his assessment of a claimant's residual functional capacity, and in reviewing that determination a court must confine itself to the reasons supplied by the ALJ." ***Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir. 2009).**

Therefore, the ALJ *himself* must connect the evidence to the conclusion through an accurate and logical bridge. *Id.* (emphasis added) (*citing Berger v. Astrue,* **516 F.3d 544 (7th Cir. 2008); Giles v. Astrue,** **483 F.3d 483, 487-88 (7th Cir. 2007); Ribaudo v. Barnhart,** **458 F.3d 580, 584 (7th Cir. 2006).** In this case, the ALJ failed to adequately explain why Thies's severe impairment of depression would not limit him from performing sedentary work.

As an initial matter, it is not clear whether the ALJ relied on Dr. Deppe's opinion at all when he determined Thies could perform sedentary work. While determining that Thies's mental impairments did not meet or medically equal one of the listed impairments that would render him disabled, the ALJ acknowledged Dr. Deppe found Thies had moderate difficulties "with regard to concentration, persistence or pace." (R. at 20-21). However, the ALJ chose not to mention Dr. Deppe at all when he determined Thies's residual functional capacity (R. at 21-23). With regard to Dr. Henson's opinion that "Thies was moderately limited in his ability to carry out detailed instructions and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," the ALJ found his opinion was accurate so far as it suggested Thies would have "difficult with semiskilled or skilled work." (R. at 23).

The ALJ chose not to specifically address the moderate limitations Dr. Henson and Dr. Deppe stated Thies had. *See id.* The ALJ also gave no weight to Thies's testimony that he believed his inability to concentrate would affect him working at a job that required him to sit most of the day (R. at 23, 466), and similarly discounted Dr. Davidson's opinion stating the pain medication Thies took resulted in confusion and affected his ability to concentrate (R. at 23). Ignoring this evidence was improper because an ALJ "may not ignore an entire line of evidence that is contrary to her findings." ***Zurawski*, 245 F.3d at 888.** Moreover, the ALJ's finding that

Thies's depression limits him to "performing simple, repetitive tasks with only occasional contact with the public, coworkers and supervisors" does not sufficiently address Thies's moderate limitations noted by Dr. Deppe and Dr. Henson because "merely limiting a claimant to simple tasks does not adequately address a claimant's moderate limitations of concentration, persistence, and pace." *Fuller v. Astrue,* **2010 WL 272877, *12 (C.D. Ill. Jan. 15, 2010);** *Stewart,* **561 F.3d at 684.**

Finally, the ALJ committed reversible error by failing to include Thies's mental impairments in his hypothetical questions posed to the VE.   A "hypothetical that an ALJ poses to a VE ordinarily must include all the limitations supported by medical evidence in the record, including limitations imposed by depression." *Patty v. Barnhart,* **2006 WL 1881367, **5-6 (7th Cir. Jul. 10, 2006)** (*citing Steele v. Barnhart,* **290 F.3d 936, 952 (7th Cir. 2002));** *Young v. Barnhart,* **362 F.3d 995, 1003 (7th Cir. 2004);** *Johansen v. Barnhart,* **314 F.3d 283, 289 (7th Cir. 2002).** "The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele,* **290 F.3d at 942.**   Consequently, "[w]hen the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." *Young,* **362 F.3d at 1004.**   An ALJ may nevertheless rely on a VE's testimony that was based on a flawed hypothetical when the record supports the conclusion that the that the vocational expert considered the medical reports and documents. *See Patty,* **2006 WL 1881367 at**5-6 (7th Cir. Jul. 10, 2006)** (*citing Ehrhart v. Sec'y of Health and Human Serv.,* **969 F.2d 534, 540 (7th Cir. 1992))***; Young,* **362 F.3d at 1004;** *see also Fuller,* **2010 WL 272877 at *12 (noting "if the**

**hypothetical does not include all of a claimant's limitations, the record must demonstrate that the vocational expert knew and understood the extent of the claimant's limitations by, for example, evaluating medical records and testimony).**

In the hypothetical questions posed to the VE, the ALJ asked him to consider a person who "could perform simple, repetitive tasks, [with] occasional contact with co-workers, supervisors, and the public" (R. at 473). The Seventh Circuit has repeatedly held that such a hypothetical fails to adequately account for limitations regarding "concentration, persistence or pace." *Stewart,* **561 F.3d at 684 (noting the hypothetical posed "must account for documented limitations of concentration, persistence or pace," and a hypothetical limiting a claimant to "simple, routine tasks that do not require constant interaction with coworkers or the general public does not adequately account for these limitations.");** *see also Young,* **362 F.3d at 1004;** *Craft,* **539 F.3d at 677-78.** Additionally, these flawed hypotheticals cannot stand because the VE testified that he did not review all of the medical evidence in Thies's file and primarily focused on the vocational evidence (R. at 475). Consequently, it is questionable the VE understood Thies was depressed, and had he known, it may have affected his analysis of the jobs Thies could perform.

On remand, the ALJ must properly evaluate the affect Thies's depression has on his residual functional capacity by considering all of the evidence, and by posing a hypothetical that includes Thies's depression as limitation.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the case be **REVERSED** and **REMANDED** to the Commissioner to re-evaluate Thies's claim for disability insurance benefits in accordance with this opinion. *See* **42 U.S.C. § 405(g).**

**IT IS SO ORDERED.**

**Dated:  February 24, 2010**                    *Donald G. Wilkerson*
                                                 **Donald G. Wilkerson**
                                                 **United States Magistrate Judge**

33